```
┌─────────────────────────────────┐
│ USDS SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____           │
│ DATE FILED: 11/30/09            │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

DOMINIC F. AMOROSA,

               Plaintiff,

                            03 Civ. 3902 (CM)

-against-

ERNST & YOUNG LLP,    Copies ~~mailed/faxed~~ ...ued to counsel on 11/30/09

               Defendant.

———————————————————————————— x

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT IN ITS ENTIRETY

McMahon, J.:

### INTRODUCTION

      Dominic F. Amorosa was a private investor who purchased common stock of America Online, Inc. ("AOL") prior to its merger with Time Warner, Inc. ("Time Warner"). As a pre-merger stockholder, Amorosa voted in favor of the merger, and on January 11, 2001, exchanged his shares at a one-to-one ratio for shares in the successor corporation, AOL Time Warner, Inc. ("AOLTW").

      More than a year and a half after the merger, the *Washington Post* published a two-part series of articles exposing widespread fraud at AOL and its successor corporation. Shortly thereafter, AOLTW, its executives and auditors found themselves facing hundreds of lawsuits arising from some of the same accounting practices the *Washington Post* had detailed. Amorosa commenced this action, the last of those suits, on May 29, 2003, naming as defendants AOL, Time Warner, AOLTW, eleven individual executives, Bertelsmann AG and auditor Ernst & Young LLP ("Ernst & Young"). Presently, only one defendant (Ernst & Young) remains in his suit. Amorosa's complaint

as amended alleges that Ernst & Young as auditor to AOL, Time Warner and AOLTW

engaged in fraud in violation of federal and state law when it issued audited financial

statements approving of the company's faulty accounting, and that the auditor aided and

abetted the company's fraud in violation of state laws. Ernst & Young has responded by

filing the motions *sub judice*: a 12(b)(6) motion to dismiss Amorosa's complaint and a

motion for sanctions under Rule 11 alleging that Amorosa's claims are frivolous.

For the reasons set forth below, Ernst & Young's motion to dismiss is granted in

its entirety. Its motion for sanctions is neither granted nor denied; however, Ernst &

Young is directed to produce a reasonable estimate of the attorneys' fees it seeks in

connection with its motion, and plaintiff's attorney is ordered to show cause why

sanctions should not be imposed.

## FACTS

### Amorosa's Stock Purchases

AOL and Time Warner announced their intent to merge on January 10, 2000.

(Second Am. Compl. ("SAC"), Nov. 14, 2007, ¶¶ 12, 70.)  Over the next three days,

Amorosa purchased 16,000 shares of pre-merger AOL common stock at allegedly

inflated prices ranging from $61.89 to $65.88 per share.  (Id. ¶ 5.)

Then, on May 19, 2000, AOL and Time Warner took the next step toward

consummating a merger between the two companies by jointly filing a Merger

Registration Statement ("MRS") with the Securities and Exchange Commission ("SEC").

(Id. ¶¶ 13-14, 86.)  The MRS contained selected historical financial data and AOL's

previous SEC filings for shareholders to review in determining whether to support the

merger, including inter alia:

2

(1) AOL's 10-K for the fiscal year ended 06/30/99;

(2) AOL's 10-Qs for the quarterly periods ended 09/30/99, 12/31/99 and 03/31/00;

(3) AOL's 8-Ks dated 12/01/99, 12/21/99, 01/10/00, 01/19/00, 03/17/00, 04/03/00, and 04/18/00.

(Id. ¶¶ 15, 17, 21.)  AOL's 06/30/99 10-K (the "June 1999 Opinion" or "06/30/99 Opinion") was the only audited financial statement incorporated into the MRS; the others were "reviewed and approved" but never "certified" by AOL's auditor, Ernst & Young. (See id. ¶ 18.)  Additionally, between the filing of the MRS and the consummation of the merger, Ernst & Young approved two additional audited financial statements on June 30, 2000 (the "June 2000" or "06/30/2000 Opinion") and December 31, 2000 (the "December 2000 Opinion" or "12/31/2000 Opinion").  (See Ernst & Young Mem. of Law in Supp. of Mot. to Dismiss ("E&Y MTD"), Jan. 18, 2008, at 5 (citation omitted).)  The fourth and final audited statement prepared by the auditor was released on December 31, 2001 (the "December 2001 Opinion" or "12/31/2001 Opinion").  (Id.)

Four months after AOL and Time Warner had first filed the MRS with the SEC, Amorosa purchased an additional 330 shares of pre-merger AOL common stock at $54.56.  (SAC ¶ 5.)  One week later, on June 23, 2000, AOL and Time Warner shareholders approved the merger (id. ¶ 12), and approximately seven months later, in January 2001, Amorosa exchanged his shares of AOL common stock for 16,330 shares of AOLTW common stock (id. ¶ 5).  Since that transaction, he has neither purchased nor sold any AOLTW stock.  (Id.)

**Ernst & Young's Involvement in the AOLTW Merger**

Ernst & Young was the independent auditor for AOL, Time Warner and AOLTW at all relevant times prior to the AOLTW merger.  (Id. ¶ 6.)  As the independent auditor,

3

Ernst & Young "audited and issued audit reports on the companies' year-end financial statements," including audit opinions for the years 1999-2001. (E&Y MTD at 5 (citation omitted).)

Amorosa alleges that Ernst & Young's wrongdoing stems from the auditor's role in approving certain false and misleading financial statements that were incorporated by reference into the MRS. Specifically, Amorosa alleges that AOL's June 1999 Opinion was audited and certified as "clean" by Ernst & Young, and AOL's interim results were reviewed and approved by the auditor. (SAC ¶¶ 18, 21.) A "clean unqualified opinion" indicates that the auditor has reviewed a company's financial statements in keeping with Generally Accepted Auditing Standards ("GAAS") and that the financial statements themselves comport with Generally Accepted Accounting Principles ("GAAP"). (Id. ¶¶ 21.) However, Amorosa alleges that no financial statement prepared and reviewed by Ernst & Young should ever have been certified as "clean" because Ernst & Young knew that AOL was actually relying upon non-GAAP accounting methods to fraudulently book certain revenues and conceal losses. (Id. ¶ 37.) Specifically, Amorosa alleges that Ernst & Young ignored certain "red flags" between 1999 and 2001 (id. ¶¶ 32, 45), and that Ernst & Young's "audit workpapers" demonstrate that it "knew" of fraud and helped to conceal it by advising the company to "keep the percentage of barter revenue under 10% of total advertising revenue." (Id. ¶ 33.) Amorosa further alleges that Ernst & Young "failed to challenge" the company's accounting for a series of transactions (id. ¶ 34), even though the auditor "reviewed at least twelve transactions where the impropriety of revenue recognition was readily apparent" (id. ¶ 36).

4

**Reports of the Fraud at AOL**

According to Amorosa, throughout 2001 and 2002, scattered news reports began

to expose AOL's improper accounting practices. Some—but not all—were directly

related specifically to the company's booking of online advertising revenue. (Id. ¶¶ 22,

359.) The examples cited by Amorosa can be divided into four categories and include the

following:

Reports Regarding AOL/AOLTW's Financial Health
- A January 12, 2001 *Bloomberg* article that stated: "some on Wall Street have grown skeptical that the new company [AOLTW] will be able to meet its own projected growth rates." (Id. ¶ 359(a) (internal quotations omitted).)

- A February 1, 2001 *Wall Street Journal* article reporting concerns that AOLTW might not meet its "aggressive '01 financial targets following disappointing 4Q '00 results." (Id. ¶ 359(b).)

- A July 18, 2001, J.P. Morgan analyst report questioning AOLTW's ability to meet its "aggressive post-Merger financial targets." (Id. ¶ 359(d) (internal quotations omitted).)

- On August 14, 2001, the *Washington Post* reported that AOLTW was "expected to announce a round of substantial layoffs at its online unit [AOL] soon." That same day, "Morgan Stanley reduced its financial targets for the company." (Id. ¶ 359(e) (internal quotations omitted).)

- A September 7, 2001 Lehman Brothers forecast for AOLTW that cut revenue projections in part due to "a softer environment and more tempered top line growth at AOL." (Id. ¶ 359(f) (internal quotations omitted).)

- An October 8, 2001 *Barron's* article addressing "AOLTW's inability to accelerate its growth and meet its aggressive financial targets." (Id. ¶ 359(g).)

- An October 17, 2001 Merrill Lynch downgrade of AOLTW stock "due to concerns about future advertising revenue and subscriber growth." (Id. ¶ 359(h).)

- A December 6, 2001 *Bloomberg* report speculating that AOL CEO Gerald Levin's resignation "may signal weakness." (Id. ¶ 359(i).)

- A December 7, 2001 Merrill Lynch report stating that AOLTW "may be hampered by slowing subscriber and advertising growth at its America Online

unit." (Id. ¶ 359(j) (internal quotations omitted).)

- A December 10, 2001 analyst report revising downward estimates for the AOLTW segment, because "the AOL segment is at risk of continuing margin erosion, driven primarily by declining ad and commerce revenue." (Id. ¶ 359(k) (internal quotations omitted).)

- A February 20, 2002 Lehman Brothers downgrade of AOLTW stock, which cited as "key concerns" "declining subscriber revenues and online advertising." (Id. ¶ 359(l).)

- A June 4, 2002 Lehman Brothers downward revision of AOL advertising revenue forecasts. (Id. ¶ 359(o).)

Reports of SEC Investigations
- A May 21, 2002 *USA Today* article that Amorosa alleges reported on an SEC investigation of AOL's accounting practices, including the SEC's inquiry into the company's "bartering" transactions. (Id. ¶ 359(n).)

- The July 25, 2002 "disclosure" of an SEC investigation regarding AOL's accounting practices, which Amorosa did not attribute to any source. (Id. ¶ 359(r).)

Reports of General Accounting "Problems"
- A July 11, 2001 *Fortune* article entitled "Do AOL's Ads Add Up - Critics Question the Numbers," which referred to "controversial sales tactics" and "accounting games." (Id. ¶ 359(c) (internal quotations omitted).)

- An April 11, 2002 *New York Post* article reporting that AOL "may have accounting problems." (Id. ¶ 359(m) (internal quotations omitted.)

- June 26, 2002 "rumors," which Amorosa did not attribute to any source, regarding the potential that AOL would restate its financial results. (Id. ¶ 359(p).)

Reports of Specific Financial Misstatements
- July 18 and 19, 2002 *Washington Post* articles regarding AOL's accounting manipulations, which identified "certain transactions from which AOL falsely recorded revenue." (Id. ¶ 359(q).)

Significantly, although Amorosa does specify a percentage by which he alleges the

AOL/AOLTW stock dropped on the date of each of the above articles, his recollection of

these news reports is slapdash at best. For example, although Amorosa alleges that *USA*

*Today* "identified AOLTW as one company relying on [bartering] transaction[s]," the

May 21, 2002 *USA Today* article does not actually identify AOLTW as having booked

bartered transactions. (Compare SAC ¶ 359(n) with Matt Krantz, Regulators Look

Closely at Bartering, USA Today, May 21, 2002, at 3B.) More importantly, of the many

reports cited by Amorosa, *only* the *Washington Post* articles that were published on July

18 and 19, 2002, identify specific transactions at AOL that Amorosa alleges to have been

fraudulent. (See generally SAC ¶ 359.)

**Financial Restatements**

Within two weeks after the July 2002 *Washington Post* story, AOLTW had

confirmed that it was the subject of both SEC and Department of Justice ("DOJ")

investigations regarding its accounting practices. (Id. ¶ 240.) By October, AOLTW had

announced that it would issue financial restatements to correct for material errors in its

earlier accounting. (Id. ¶ 26.) AOLTW went on to file two additional restatements with

the SEC in February 2005 and August 2006, to correct related misstatements and

inconsistencies (id.), and "ultimately, AOL admitted that its 3rdQ 00 through 2ndQ 02

results had been misstated," and restatements issued covering the period July 1, 2000, to

June 30, 2002 (id. ¶ 340).

**Procedural History and Related Cases**

The Class Action

Not surprisingly, the various newspaper articles and reports trumpeting

allegations of fraud at AOL portended widespread litigation. Amorosa's action is the last

of these several hundred lawsuits that arose in the wake of the AOL Time Warner

merger. See generally In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 381 F.

Supp. 2d 192 (S.D.N.Y. 2004) ("AOL I"); In re AOL Time Warner, Inc. Sec. Litig., 503

F. Supp. 2d 666 (S.D.N.Y. 2007) ("AOL II"). The lawsuits filed spanned several jurisdictions and were consolidated into a multidistrict litigation before Judge Kram in the Southern District of New York, who certified the class on September 30, 2005. See AOL II, 503 F. Supp. 2d at 669. Shortly thereafter, approximately 200 plaintiffs "opted out" of the class action and filed their own claims (hereinafter the "Opt-Outs," "Opt-Out Plaintiffs" or "Lerach Plaintiffs"). Id. These Opt-Outs were all represented by common counsel (Lerach, Coughlin, Stoia, Geller Rudman & Robbins LLP) and filed complaints that were identical "with the exception of the plaintiffs listed therein and the state law claims asserted." Id. at 670 n.2. Accordingly, Judge Kram aggregated the complaints and adjudicated the claims collectively. Id.

Amorosa's Complaint and the Litigation Stay

On May 29, 2003, Amorosa, who was not a part of the class action at that time, filed his lawsuit in federal court as a "related" case, which was then referred to Judge Kram. He acknowledges that both his first and second amended complaints bear a substantial likeness to those filed by the Opt-Outs, and disputes only the scope of the similarities. (See generally Amorosa Mem. of Law in Opp. to Mot. to Dismiss ("Amorosa MTD Opp."), Feb. 14, 2008; Amorosa Mem. in Supp. of Mot. for Leave to Amend, Mar. 12, 2007, at 7.) As a practical matter, although Amorosa is represented by different counsel (Christopher J. Gray, P.C.) and otherwise has no formal relationship to the Opt-Out group, his second amended complaint is identical in all material respects to the complaint of the Opt-Out group. The two pleadings share literally hundreds of pages of identical content. (Compare, e.g., SAC ¶ 113 with Northwestern Mut. Life Found., Inc. First Am. Compl. ("Lerach Compl."), May 4, 2006, ¶ 120; SAC ¶ 163 with Lerach

8

Compl. ¶ 172; SAC ¶ 181 <u>with</u> Lerach Compl. ¶ 190; SAC ¶ 357 <u>with</u> Lerach Compl. ¶ 318.)

In light of the clear parallels between the complaints, the parties stipulated to a stay of Amorosa's federal action until the court could resolve a motion to dismiss the Opt-Outs' complaints (collectively, the "Lerach Complaint" or the "Opt-Out Complaint") that was then-pending. See <u>Amorosa v. AOL Time Warner Inc.</u>, No. 03 Civ. 3902 (No. 02 MDL 1500), Order Granting Stay ("Order Granting Stay"), July 27, 2005, at 1-2. The stipulation extended Ernst & Young's time to answer or move against the complaint to 30 days after resolution of motions. The agreement provided in relevant part that:

> Whereas plaintiff Dominic F. Amorosa ("Plaintiff") filed a First Amended Complaint (the "Complaint") in the above-captioned action on April 7, 2005; and
>
> . . .
> Whereas the Complaint is substantially similar in many respects to the second amended consolidated class complaint filed in <u>In re AOL Time Warner, Inc. Sec. & "ERISA" Litigation</u>, 02 MDL Docket No. 1500 (SWK), the related consolidated putative securities class action that is also currently pending before this Court ("the MRD Securities Litigation"); and
>
> Whereas the Complaint is also substantially similar in many respects to the amended complaint filed in <u>Stichting Pensioenfonds ABP v. AOL Time Warner Inc.</u>, 03 Civ. 4934 (SWK), a related individual securities action that is also currently pending before this Court (the "Stichting Litigation"); and
>
> . . .
> Whereas Plaintiff and E&Y wish to avoid burdening the Court with duplicative briefing on the same or similar issues; and
>
> Whereas counsel for Plaintiff and counsel for E&Y have therefore agreed to extend E&Y's time in which to answer or move against the Complaint until thirty (30) days after the Court resolves the Motion to Amend [filed by the lead plaintiff in the MDL] and the Stichting Motions to Dismiss;
>
> Now therefore it is hereby stipulated and agreed . . . that E&Y's time in which to answer or move against the Complaint is hereby extended to and including thirty (30) days after the Court resolved the Motion to Amend

and the Stichting Motions to Dismiss.

Id. (internal quotations omitted).

Although defendant Ernst & Young originally argued that Amorosa had requested the litigation stay (see E&Y MTD at 1), the parties now appear to agree that the stay of his claim was initially proposed by AOLTW (see Ernst & Young Reply in Supp. of Mot. for Sanctions ("E&Y R11 Reply"), Mar. 3, 2008, at 3; Amorosa Mem. in Opp. to Mot. for Sanctions ("Amorosa R11 Opp."), Feb. 22, 2008, at 1.)

Resolution of the Motions to Dismiss the Opt-Outs' Complaints

On June 20, 2007, Judge Kram granted in part the motions to dismiss the Lerach Complaint, allowing the Opt-Out suit to proceed on narrow grounds. See AOL II, 503 F. Supp. 2d 666. Specifically, the Lerach Complaint had alleged: (1) various violations of state law; (2) auditor liability under Section 11 of the Securities Act of 1933 ("1933 Act" or "Securities Act"); (3) liability in connection with the purchase or sale of a security under Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act"); (4) liability arising from the issuance of a proxy statement under Section 14(a) of the 1934 Act; and (5) control person claims under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act.

In adjudicating these claims, Judge Kram held:

- First, plaintiffs' state law claims were preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), because the Opt-Out Plaintiffs had a formal, established relationship pursuant to which they were jointly litigating their claims; therefore, despite the fact that each Opt-Out filed a separate copy of the Lerach Complaint with different state law claims, the Opt-Outs could be considered a "covered class action" as that term is used in SLUSA. Id. at 671-72.

- Second, plaintiffs' Section 11 claims were partially dismissed due to pleading defects—that is, they were dismissed to the extent that the Section 11 claims were based upon anything other than a June 1999 Ernst & Young audit opinion. Id. at

10

674-75.

- Third, plaintiffs' Section 10(b) claim was dismissed to the extent that liability was premised on the June 1999 Ernst & Young audit opinion because the plaintiffs could not establish loss causation as required by the 1934 Act. Additionally, plaintiffs' recovery was circumscribed. The court denied recovery insofar as plaintiffs sought compensation for losses sustained prior to publication of articles in the *Washington Post* on July 18 and 19, 2002, because as the court explained, these articles first exposed the fraud at AOL/AOLTW. Therefore, the plaintiffs could not have sustained losses arising from the fraud prior to July 18, the court opined, since the market was unaware of the fraud until then. Id. at 676-80.

- Fourth, plaintiffs' Section 14(a) claim was dismissed for failure to adequately plead loss causation relating to the proxy statement. Id.

- Fifth, plaintiffs' control person claims under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act were dismissed for failure to plead that Ernst & Young had control over a primary violator, since the primary violators were employed at AOL and Ernst & Young exercised no control over AOL personnel. Id. at 674.

- Sixth, the court also rested its dismissal of pre-merger shareholders' Section 10(b), 11, and 14(a) claims on the ground that plaintiffs had failed to "identify any alleged misstatements by [Ernst & Young] that would have been material to pre-merger AOL shareholders." Id. at 672.

Amorosa's Amended Complaint and the Motions <em>Sub Judice</em>

Amorosa amended his complaint (for a second time) in November 2007, shortly after Judge Kram issued her opinion issued in AOL II. The stated purpose of the amendment was to accommodate the new pleading standard governing loss causation announced by the Supreme Court in Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005), which was decided during the pendency of the motion to dismiss the Lerach Complaint. (See Amorosa R11 Opp. at 2.) As filed, Amorosa's second amended complaint included the following claims:

> Claim 1: Violations of Section 11 of the 1933 Act;
> Claim 2: Violations of Section 14(a) of the 1934 Act and Rule 14a-9;
> Claim 3: Violations of Section 10(b) of the 1934 Act and Rule 10b-5;
> Claim 4: Aiding and abetting a breach of fiduciary duty;

Claim 5: Common law fraud;
Claim 6: Aiding and abetting common law fraud.

(SAC ¶¶ 363-409.)

Two months after Amorosa filed his SAC, Ernst & Young filed the motion to dismiss *sub judice* and moved for Rule 11 sanctions against Mr. Gray, Amorosa's attorney. Ernst & Young contends that Amorosa is a vexatious litigant pursuing clearly frivolous claims as evidenced inter alia by the fact that his complaint was literally "copied and pasted" from the Lerach Complaint, most which Judge Kram dismissed as meritless. (Ernst & Young Mem. in Supp. of Mot. for Sanctions ("E&Y R11 Mot."), Jan. 18, 2008, at 1-2.) Amorosa maintains that his claims are different from those asserted in the Lerach Complaint and suggests that this Court sua sponte impose sanctions upon Ernst & Young for factual misstatements, including a misrepresentation relating to who initially sought the 2005 litigation stay in this case. (See generally Amorosa R11 Opp.)

## DISCUSSION

### I.    Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003); see also Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007). The Court may also consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed, or knew about and relied upon in bringing the suit. Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000); San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996). And in addition to the facts alleged in the complaint, the

Court may take judicial notice of public disclosure documents filed with the SEC,

Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991), as well as "well

publicized stock prices" for the securities in question, Ganino v. Citizen Utils. Co., 228

F.3d 154, 167 n.8 (2d Cir. 2000); see also In re Allied Capital Corp. Sec. Litig., No. 02

Civ. 3812, 2003 WL 1964184, at *3 (S.D.N.Y. Apr. 25, 2003) (citation omitted); Fant v.

Perelman, No. 97 Civ. 8435, 1999 WL 199078, at *5 (S.D.N.Y. Apr. 9, 1999) (citations

omitted).

To survive a motion to dismiss, "a complaint must contain sufficient factual

matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129

S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "While a complaint

attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,

a plaintiff's obligation to provide the grounds of his entitlement to relief requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." Twombly, 550 U.S. at 545 (internal quotations, citations, and

alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged

[his] claims across the line from conceivable to plausible, [the plaintiff's] complaint must

be dismissed." Id. at 570; Iqbal, 129 S. Ct. at 1950-51.

Claims sounding in fraud must also meet Rule 9(b)'s heightened pleading

standard. See Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a complainant "must: (1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) (internal quotations omitted). Although Rule 9(b) provides that "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. Kalnit v. Eichler, 264 F.3d 131, 137-38 (2d Cir. 2001).

Similarly, the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (1995) (codified as amended in scattered sections of 15 U.S.C.) ("PSLRA"), requires a private plaintiff bringing claims under certain federal securities laws (including Sections 10(b) and 14(a)) to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a "strong inference" of scienter, as required by the PSLRA, the inference must be such that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). Plaintiffs may discharge their burden of pleading a strong inference of scienter under both the PSLRA and Rule 9(b) by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted) (PSLRA); accord AOL I, 381 F. Supp. 2d at 213 (citations omitted) (Rule 9(b)).

14

## II.    Relevant Statements by the Auditor

As a threshold matter, an auditor's liability under the securities laws is limited to its release of audited financial statements or other statements formally attributed to the auditor at the time of dissemination.  See Lattanzio v. Deloitte & Touche, LLP, 476 F.3d 147, 155 (2d Cir. 2007) (no liability under Section 10(b) for statements not attributed to the auditor); see also Herman & MacLean v. Huddleston, 459 U.S. 375, 381 n.11 (no liability under Section 11 for financials neither prepared nor certified by the accountant).  In other words, an auditor's mere "review and approval" of a company's financial statements is wholly "insufficient to support the imposition of liability on the accountant."  Lattanzio, 476 F.3d at 155 (citation omitted).  Indeed, it is axiomatic that the auditor "can incur liability only if a misstatement is attributed to it at the time of dissemination."  Id. (citation omitted).

Amorosa's Complaint refers to only four audited financial statements: (1) the June 1999 Opinion; (2) the June 2000 Opinion; (3) the December 2000 Opinion; and (4) the December 2001 Opinion.  (E&Y MTD at 5 (citation omitted).)  Since only audited financial statements are formally attributable to an auditor at the time of their dissemination, these four opinions are the only documents that could possibly serve as the basis for Ernst & Young's liability under the 1933 and 1934 Acts.  See id. at 155.

## III.    Amorosa's Securities Claims

Amorosa alleges that Ernst & Young violated Sections 14(a) and 10(b) of the 1934 Act as well as Section 11 of the 1933 Act.  He further alleges that the auditor is liable under state law for fraud and for aiding and abetting AOL/AOLTW's fraud and breaches of fiduciary duty by its directors.  Amorosa's claims under Sections 14(a) and

10(b) of the 1934 Act are dismissed in their entirety because he has failed to plead loss

causation adequately. Additionally, Amorosa's Section 11 claim is dismissed in its

entirety because he fails to state a claim, and in any event, Amorosa's complaint makes

clear that the auditor did not cause any losses suffered by the plaintiff. Further, this Court

finds that Amorosa's state law claims are pre-empted by SLUSA.

### A.    Section 14(a) of the 1934 Act

Section 14(a) of the 1934 Act provides that "it shall be unlawful for any person by

use of the mails . . . or otherwise . . . to solicit or permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted

security) registered pursuant to section 78/ of this title." 15 U.S.C. § 78n(a). "The

purpose of [Section] 14(a) is to prevent management or others from obtaining

authorization for corporate action by means of deceptive or inadequate disclosure in

proxy solicitations." J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964), abrogated on

other grounds by Cort v. Ash, 422 U.S. 66 (1975).

As Judge Kram explained in AOL I, of the four audited financial statements, only

Ernst & Young's June 1999 Opinion could form the basis of a Section 14(a) claim

against the auditor. 381 F. Supp. 2d at 241-42. For the same reasons, only the June 1999

Opinion could have formed the basis of liability in this case, because all other Ernst &

Young audit opinions "post-dated the mailing of the Proxy/Prospectus and the

shareholder vote on the Merger," and therefore could not have functioned as a

"solicitation" predicate to liability under Section 14(a) and the accompanying rules. Id.

at 242 (citing 17 C.F.R. § 240.14a-1). However, Ernst & Young's June 1999 Opinion

cannot actually serve as the basis of a Section 14(a) claim against the auditor here,

16

because Amorosa does not adequately plead loss causation relating to that financial

statement.

>    1.    Loss Causation and the June 1999 Opinion

In order to state a claim under Section 14(a), the plaintiff bears the burden of

pleading and proving loss causation, Grace v. Rosenstock, 228 F.3d 40, 46 (2d Cir. 2000)

(citation omitted), which requires a plaintiff prove "both that the loss [was] foreseeable

and that the loss [was] caused by the materialization of the concealed risk," Lentell v.

Merrill, Lynch & Co. Inc., 396 F.3d 161, 173 (2d Cir. 2005).  In this context, the Second

Circuit has explained that allegations regarding a security's inflated purchase price,

without more, are insufficient to satisfy the loss causation requirement.  Emergent Capital

Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003).

The Second Circuit's loss causation jurisprudence comports with the Supreme

Court's articulation of the loss causation requirement in Dura Pharm., Inc. v. Broudo, 544

U.S. 336 (2005), wherein the Court held that a plaintiff pleading fraud based upon an

allegedly inflated purchase price must also allege that the price of the security "fell

significantly after the truth became known" in order to state a claim under the federal

securities laws.  Id. at 347.  Additionally, consonant with the requirements of Dura

Pharmaceuticals, the Second Circuit has explained that in order to adequately plead loss

causation, a complaint must at a minimum "allege facts that support an inference that

[defendant's] misstatements and omissions concealed the circumstances that bear upon

the loss suffered such that plaintiffs would have been spared all or an ascertainable

portion of that loss absent the fraud."  Lentell, 396 F.3d at 175.  Thus, for example, loss

causation pleadings have been found to be sufficient where the plaintiffs "specifically

17

asserted a causal connection between the concealed information . . . and the ultimate failure of the venture," Emergent Capital, 343 F.3d at 198, and where the alleged misstatements were "the reason the transaction turned out to be a losing one," First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994) (citing cases). In both of these cases, the loss causation allegations were sufficient because the pleadings specifically indicated that "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions." Lentell, 396 F.3d at 173 (emphasis in original).

By contrast, loss causation allegations are insufficient where they do not "speak to the relationship between the fraud and the loss of the investment." Id. at 174 (citing cases). For example, it is insufficient under the law of this Circuit to allege simply that a defendant's misstatements or omissions "induced a disparity between the price plaintiff paid for [securities] and their true investment quality." Emergent Capital, 343 F.3d at 198 (internal quotations omitted). So is failing to "plead facts which, if proven, would show that [the] loss was caused by the alleged misstatements as opposed to intervening events" in a case where a plaintiff's alleged losses coincide with a marketwide phenomenon causing comparable losses to other investors. First Nationwide Bank, 27 F.3d at 772.

Further, in cases where, as here, a plaintiff seeks to hold a financial advisor or auditor responsible for primary violations of the securities laws, the plaintiff must plead that the market reacted negatively to some disclosure correcting the falsity in the advisor or auditor's statements (and not simply the underlying fraud). See Lentell, 396 F.3d at 175. Thus, in Lentell, loss causation was inadequately pleaded as against Merrill Lynch

because "there [was] no allegation that the market reacted negatively to a corrective

disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations and

no allegation that Merrill misstated or omitted risks that did lead to the loss." Id.

(footnote omitted).

Analyzing loss causation under the Second Circuit's framework and as pleaded in

the Lerach Complaint, Judge Kram in AOL II held that the June 1999 Opinion could not

be the basis for imposing liability under Sections 10 or 14 because:

> The plaintiffs do not allege that the 6/30/99 AOL Opinion was ever the
> subject of a corrective disclosure.  In fact, the plaintiffs do not allege that
> the financial results certified by that Opinion were ever restated, or that
> the truth of that Opinion was called into question at any time during the
> AOLTW stock decline that caused their losses.  Nor do the plaintiffs
> allege that the two allegedly fraudulent transactions entered into during
> that period were either corrected or brought to the market's attention prior
> to the stock's bottoming out at the end of July 2002.  In short, the
> plaintiffs have not alleged that the market reacted negatively to the
> revelation of the 6/30/99 AOL Opinion's alleged falsity.
>
> Furthermore, the plaintiffs cannot connect any of their losses to E & Y on
> a materialization of the risk theory, whether those losses purportedly arose
> out of the 6/30/99 AOL Opinion or out of any other allegedly false audit
> opinions.  In each of the cases in which the Second Circuit has employed a
> materialization of the risk analysis, it has considered a particular risk that
> was allegedly concealed by the defendant's actions and which then
> materialized to cause a market loss . . . . Without providing some
> indication of the nature of the risk alleged, bare allegations that an
> undisclosed risk materialized to cause a plaintiff's loss are insufficient.
> Here, the plaintiffs do not adequately identify what risk was concealed by
> the allegedly false audit opinions, nor does the Court's scrutiny of the
> Complaint reveal the materialization of any risk that would be sufficient to
> plead loss causation.

503 F. Supp. 2d at 678 (citations omitted).

Amorosa now urges this Court to reject the reasoning of AOL II in light of certain

revisions he has made to his complaint since the date of that decision. (Amorosa MTD

Opp. at 14-18.)  Specifically, he argues that, unlike the Opt-Outs, he "has pleaded what

corrective disclosures occurred, where, and on what date, how much AOLTW stock dropped in price at the times of the corrective disclosures, and that each drop was statistically significant." (Id. at 14 (citing SAC ¶ 359).) But any difference between Amorosa's amended complaint and the Lerach Complaint is superficial and insufficient to render Amorosa's allegations materially different from the Lerach Complaint.

Amorosa cites two paragraphs from his complaint that he believes differentiate it from the Lerach Complaint, though neither rehabilitates his pleadings. First, Amorosa points to a May 21, 2002 article in *USA Today*, which he alleges highlighted rumors regarding AOL's "sham" accounting. (See Amorosa MTD Opp. at 16 (citing SAC ¶ 359(n)).) Apart from Amorosa's failure to connect the article to the June 1999 Opinion, Judge Kram already held that any "disclosures" in this article were an insufficient basis on which to hang loss causation. AOL II, 503 F. Supp. 2d at 679. Moreover, Amorosa completely misrepresents the content of that article, which mentioned one AOL-related transaction—a deal with SportsLine.com—but made no mention of AOL's accounting practices. Indeed, the mention of AOL in this article was entirely incidental; *USA Today* was actually reporting on the accounting practices of SportsLine (and others)—but not AOL. See Matt Krantz, Regulators Look Closely at Bartering, USA Today, May 21, 2002, at 3B. Further, the article is careful to point out that the "bartering" transactions it profiles are not necessarily illegal because "accounting rules stipulate it can be booked as revenue if a company collected cash for a similar deal in the past six months." Id. Since the article altogether fails to mention AOL's accounting practices, and in fact does not pass judgment on the legality of the accounting practices it does mention, it cannot

possibly be interpreted to have exposed any alleged fraud at AOL, and therefore cannot be relied upon to loss causation.

Second, Amorosa argues that he adequately pleaded loss causation because he alleged that "the 06/30/99 opinion was false and misleading in that it failed to reveal that the revenues reported therein included revenues from 'barter' transactions that should not have been permitted to be recognized as revenue under GAAP." (Amorosa MTD Opp. at 16 (citing SAC ¶ 30).) However, Amorosa still does not allege that the June 1999 Opinion was ever the subject of any corrective disclosure. See AOL II, 503 F. Supp. 2d at 678. He also fails to allege that the truth of the June 1999 Opinion was "called into question" at any time during the purported stock decline that arguably caused his losses. See id. Indeed, paragraph 30, which Amorosa relies on to substantiate his loss causation allegations, does not mention the June 1999 Opinion by name; does not mention any *audited* or *annual* financial statement (of which the June 1999 Opinion is one); and does not mention Ernst & Young or any other auditors. (See SAC ¶ 30.) Rather, it simply states that "AOLTW violated Regulation S-X," by "fraudulently inflat[ing] reported revenue between Q3 1998 and Q2 2002 via barter deals . . . ." (Id.) If anything, paragraph 30 attributes misstatements *solely to AOLTW*. (See id.) This is understandable, as Amorosa's original complaint was brought against AOL, Time Warner, AOLTW and eleven of its executives.

As was the case with Merrill Lynch in Lentell, Amorosa has failed to allege, as required, that the market reacted negatively to some corrective disclosure regarding the falsity of statements made by Ernst & Young in its June 1999 Opinion. See Lentell, 396 F.3d at 175 (dismissing claim for failure to allege a negative reaction to Merrill Lynch's

21

"buy" or "accumulate" recommendations).  Thus, under the standard pronounced in Lentell, Amorosa's pleading as related to the June 1999 Opinion is insufficient to "support an inference" that Amorosa "would have been spared all or an ascertainable portion of [his] loss absent the fraud," if the June 1999 Opinion had not certified AOL's financial statements.  Amorosa's Section 14(a) claim thus fails for lack of allegations relating to loss causation.  Id.

### B.   Section 10(b)

Section 10(b) of the 1934 Act provides that no person or entity may, in connection with the purchase or sale of a security, "use or employ . . . any manipulative or deceptive device or contrivance" in contravention of an SEC rule.  15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit up on any person."  17 C.F.R. § 240.10b-5.

To establish liability under Section 10(b), the SEC must show that "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission, if the defendant had a duty to speak) or used a fraudulent device."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (citing cases).  A misrepresentation is material if there is "a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v.

Levinson, 485 U.S. 224, 231-32 (1988) (citation omitted).  Materiality generally presents

a mixed question of law and fact.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450

(1976).  Thus, a court should not grant a motion to dismiss "on the ground that the

alleged misstatements or omissions are not material unless they are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the

question of their importance."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

>    1.    Loss Causation and the June 2000 and December 2000 Ernst & Young
>          Audit Opinions

In AOL II, Judge Kram held that any pre-merger misstatements or omissions were

immaterial as a matter of law, because any "corrective disclosure" would only have

redoubled AOL shareholders' resolve to consummate the AOLTW merger.  AOL II, 503

F. Supp. 2d at 672-73.  However, this Court finds it unnecessary to reach the question of

materiality with respect to any alleged misstatements or omissions in the June 1999, June

2000 and December 2000 Opinions.  Amorosa has failed to plead loss causation

adequately with regard to any of these financial statements.

Amorosa had the burden of pleading and proving loss causation under Section

10(b).  See, e.g., In re Flag Telecom. Holdings Ltd. Sec. Litig., 574 F.3d 29, 40-41 (2d

Cir. 2009).  Amorosa's complaint in this respect is materially identical to the Lerach

Complaint.  He did not address facial deficiencies identified in AOL II when he amended

his pleading; therefore, his Section 10(b) claim fails to the extent liability is premised on

the June 1999 Opinion.  See supra Part III.A.1.

As for later Ernst & Young opinions, Amorosa fails to allege that either the June

or December 2000 Opinions were the subject of a corrective disclosure before he brought

suit in May 2003, or that their truth was called into question at any time during the stock

decline that he argues caused his losses.  (See SAC ¶ 35 (financials for 2000 not restated until 2005).)  Thus, although Amorosa does allege that the June and December 2000 Opinions, like June 1999 Opinion, contained Ernst & Young's unqualified certification that the financial statements were prepared in accordance with GAAP (see SAC ¶¶ 365-66), his failure to plead any facts which, if proven, would substantiate his assertion that Ernst & Young's certifications were indeed the cause of his losses is fatal to his claim.

The only allegations relating to Ernst & Young fail to establish a sufficient nexus between misstatements by the auditor arising specifically out of the June or December 2000 Opinions and losses alleged by the plaintiff.  For example, Amorosa alleges that auditor ignored "red flags" between 1999 and 2001.  (Id. ¶¶ 32, 45).  This allegation is purely conclusory and mentions neither the June nor December 2000 Opinions.  Next, Amorosa alleges that Ernst & Young's "audit workpapers" demonstrate that it "knew" of fraud at AOLTW but that it failed to "put a stop" to the practice and instead advised the company to "keep the percentage of barter revenue under 10% of total advertising revenue."  (Id. ¶ 33.)  This allegation affords no basis for imputing liability to Ernst & Young, because AOLTW existed only *after* the merger.  Therefore, Ernst & Young's purported advice about AOLTW's accounting necessarily postdates the June and December 2000 Opinions (filed only on behalf of AOL) as well as Amorosa's share exchange (his last transaction involving AOL/AOLTW stock).

Amorosa's statements that Ernst & Young "allowed AOLTW to account for its interest in its European joint venture, AOL Europe, using a non-GAAP method of accounting" and "ignore[d] the fraudulent financial reporting" suffer from the same defect.  (Id. ¶ 35; see also id. ¶ 44.)  Insofar as this allegation relates to AOLTW, it

24

postdates the merger and is therefore insufficient to suggest that there was fraud at AOL in the months prior to the merger. To the extent that the disclosure relates to AOL, Amorosa alleges that "the Company [not Ernst & Young] subsequently admitted in its second restatement in 2005, it should have consolidated the results of AOL-Europe's operations and recognized 100% of these losses." (Id. ¶ 35 (emphasis omitted).) Additionally, the fact that the restatement issued in 2005 suggests that any previous misstatements by the auditor that were corrected therein did not cause Amorosa's losses, since Amorosa brought suit in 2003, two years before the restatement issued.

Amorosa further alleges that that the auditor "failed to challenge" the company's accounting for a series of transactions even though Ernst & Young "reviewed at least twelve transactions, where the impropriety of revenue recognition was readily apparent." (Id. ¶ 36; see also id. ¶ 34.) This allegation does not reference any specific transactions, and fails to mention the December 2000 Opinion (or any related financial statements). It also fails to include any date by which the auditor should have challenged AOL's accounting, and omits reference to the specific accounting "problems" of which the auditor should have been aware; therefore, it provides no nexus between any purported fraud and the losses allegedly suffered by the plaintiff.

Amorosa's allegations do not include facts which, if proven, would establish that Ernst & Young could be held liable as a primary violator, because they do not refer to any misstatements by the auditor and fail to connect any fraud at AOL during the relevant time period to the auditor itself. As Lentell makes clear, Amorosa must identify specific statements implicating the auditor that causally relate in some way to the losses he alleges he suffered. See 396 F.3d at 175. Amorosa's failure to plead facts connecting specific

statements made by the auditor to losses incurred by Amorosa is fatal to his Section 10(b) claim under the law of this Circuit.  See id.

> 2.    The Purchaser-Seller Limitation Under Federal Law

Amorosa tries to bootstrap his way into a Section 10 claim by arguing that the Supreme Court abandoned the "purchaser-seller" standing requirement in private securities actions in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006).  (See Amorosa MTD Opp. at 19 (citing Dabit).)  If this were true, it would allow Amorosa to assert a federal claim as a "holder" of securities, based on any misrepresentations or omissions between the date on which he exchanged his AOL shares pursuant to the merger agreement (January 11, 2001) and the date on which he brought suit.  (See id.)  Actionable misstatements could have included, for example, Ernst & Young's fourth audited financial statement, the December 2001 Opinion.

Unfortunately for Amorosa, his interpretation of Dabit misconstrues its core holding and contradicts the plain language of the opinion.

The purchaser-seller limitation on the private right of action under the securities laws (Rule 10b-5) was first announced by the Second Circuit in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952).  In that case, the Second Circuit upheld the dismissal of a suit brought on behalf of a corporation alleging violations of Rule 10b-5 arising from fraud "in connection with" a director's sale of his controlling block of stock to third parties.  Id. at 464.  The Second Circuit explained that Rule 10b-5 could only be invoked by a "purchaser" or "seller" of securities to remedy fraud associated with an individual's transaction.  Id.  Therefore, Rule 10b-5 did not protect those who neither purchased nor sold the securities, but who were instead injured by the corporate insiders'

26

sales to third parties. Id. Although many lower courts adopted the Birnbaum rationale, others continued to interpret the coverage of Rule 10b-5 more broadly. As a result, the Supreme Court was forced to revisit Birnbaum in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). See Dabit, 547 U.S. at 80.

In Blue Chip Stamps, the Supreme Court "chose to limit the private remedy" afforded by Section 10(b) to purchasers and sellers. Id. As the Court explained in Dabit, "the main policy consideration tipping the scales in favor of precedent was the widespread recognition that 'litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general.'" Id. (quoting Blue Chip Stamps, 421 U.S. at 739). Thus, the Blue Chip Stamps Court "relied chiefly, and candidly, on 'policy considerations' in adopting [the purchaser-seller] limitation." Id. at 84. (quoting Blue Chip Stamps, 421 U.S. at 737). In other words, as the Dabit Court explained, "The Blue Chip Stamps Court purported to define the scope of a private right of action under Rule 10b-5 *not* to define the words 'in connection with the purchase or sale.'" Id. (citing Blue Chip Stamps, 421 U.S. at 749) (emphasis added). Indeed, the Blue Chip Stamps Court had noted that the statutory "in connection with" language did not speak "to the contours of a private cause of action" under the securities laws. 421 U.S. at 749.

By contrast, the Supreme Court in Dabit interpreted the statutory phrase, "in connection with the purchase or sale," as used in the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227 (1998) (codified in part at 15 U.S.C. § 77v(a)). See Dabit, 547 U.S. at 85. Title I of SLUSA provides that "no covered class action" based on state law and alleging "a misrepresentation or

27

omission of a material fact *in connection with* the purchase or sale of a covered security. . . . may be maintained in any State or Federal Court by any private party." 15 U.S.C. § 78bb(f)(1)(A) (emphasis added). In Dabit, the Supreme Court held that this language could be applied to preempt claims brought by holders of securities, not just purchasers or sellers. 547 U.S. at 85-87.

Section 10 and Rule 10b-5, like SLUSA, all employ the phrase "in connection with" the purchase or sale of a covered security. However, the Supreme Court in Dabit stated clearly that it did *not* purport "revisit the Blue Chip Stamps Court's understanding of the equities involved in limiting the availability of private remedies under federal law." Id. at 88 n.13. That means a "holder" plaintiff continues to have no private right of action under Section 10(b) of the 1934 Act. Rather, the Court interpreted the phrase as consonant with the meaning afforded it in two government enforcement actions, SEC v. Zandford, 535 U.S. 813, 820 (2002), and United States v. O'Hagan, 521 U.S. 642, 651 (1997). Those cases do not speak to the contours of a private right of action under the securities laws, as the actions were not brought by private litigants. Dabit's holding interpreted only "Congress' intent in adopting a preemption provision, the evident purpose of which [was] to limit the availability of remedies under state law." Dabit, 547 U.S. at 88 n.13.

In this case, the practical impact of Blue Chip Stamps would be to limit Amorosa's cause of action to misstatements or omissions by Ernst & Young that he could have relied upon in connection with his *purchase or sale* of stock (i.e., that are alleged to have occurred prior to the purchase and/or sale dates). These would include the June 1999, June 2000 and December 2000 Opinions, since Amorosa alleges that he purchased

shares on two occasions prior to the merger: January 10 and June 23, 2000, and he

exchanged ("sold") his shares for AOLTW common stock pursuant to the terms of the

merger in January 2001.  (SAC ¶ 5.)  Since Amorosa has failed to adequately allege loss

causation with respect to any of these opinions, see supra Parts III.A.1&B.1, he has failed

to state a claim under Section 10(b).

### C.    Section 11

Amorosa, like the Lerach Plaintiffs, alleges that Ernst & Young is liable for

misstatements contained in AOLTW's Merger Registration Statement ("MRS"), which

was filed with the SEC on February 11, 2000.

Section 11 of the 1933 Act provides that any signer, director of the issuer,

preparing or certifying accountant, or underwriter may be liable if "any part of the

registration statement, when such part became effective, contained an untrue statement of

a material fact or omitted to state a material fact required to be stated therein or necessary

to make the statements therein not misleading . . . ."  15 U.S.C. § 77k(a).  To state a claim

under Section 11 of the 1933 Act, a plaintiff must show that a registration statement: "(1)

contained an untrue statement of material fact; (2) omitted to state a material fact required

to be stated therein; or (3) omitted to state a material fact necessary to make the statement

therein not misleading."  Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 408

(S.D.N.Y. 2007) (internal quotations and citations omitted).

Further, while "liability against the issuer of a security is virtually absolute, even

for innocent misstatements," accountant liability under Section 11 (as with Section 10(b))

is limited to "those matters which purport to have been prepared or certified by them."

Herman & MacLean v. Huddleston, 459 U.S. 375, 381 n.11 (1983) (citing 15 U.S.C. §

29

77k(a)(4)); accord AOL II, 503 F. Supp. 2d at 675 n.8 (S.D.N.Y. 2007) (no liability under Section 11 for unaudited pro forma).  Because the only audit report included in the MRS is the audit opinion relating to AOL's June 30, 1999 financial statements, Judge Kram ruled in AOL II that the opinion in the June 30, 1999 financials was the only possible basis for imputing Section 11 liability to Ernst & Young.  503 F. Supp. 2d at 675.  This Court agrees and adopts the same approach to Section 11 in reviewing Amorosa's second amended complaint.

There are two reasons why Amorosa's Section 11 claim must be dismissed.  First, on the literal allegations of the complaint, it is time barred.  While securities claims sounding in fraud must be brought the earlier of two years after discovery of the violation or five years after the violation itself, 28 U.S.C. § 1658(b), claims under section 11, which sound in negligence (rather than fraud), are subject to a shorter statute of limitations, In re Global Crossing Ltd. Sec. Litig., 313 F. Supp. 2d 189, 196 (S.D.N.Y. 2003).  They must be brought "within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence," and in any event no later than three years after the securities in question were offered to the public.  15 U.S.C. § 77m.  The securities in question were offered to the public at the latest on January 11, 2001, when the shareholders were invited to exchange their shares pursuant to the merger agreement between AOL and AOLTW; thus, the limitations period could terminate, at the latest, on January 11, 2004.  However, where, as here, the one year discovery period ends prior to three years from January 11, 2001, the one year limitations period is applicable instead.

Amorosa alleges that the first corrective disclosure relating to AOL/AOLTW "fraud" occurred on January 12, 2001. If this allegation is true, then the fact that Amorosa waited almost two and a half years—until May 29, 2003—to file suit means that his claim falls outside the applicable limitations period. See id.

Alternatively, if the Court adopts Judge Kram's holding that any so-called "corrective disclosures" that occurred prior to July 18, 2002, failed to "establish a nexus between any of [Ernst & Young's] audit opinions and investment losses prior to July 18, 2002," AOL II, 503 F. Supp. 2d at 679, the complaint has to be dismissed because Amorosa suffered no losses during the period between July 18, 2002, and May 29, 2003, the date on which he commenced this action. The price of AOLTW stock actually increased during that period.

In light of the Second Circuit's opinion in Staehr v. The Hartford Fin. Serv. Group, Inc., 547 F.3d 406 (2d Cir. 2008), I agree with Judge Kram's conclusion that none of the earlier articles mentioned in the Lerach Complaint (or in Amorosa's) qualifies as a "corrective disclosure" of Ernst & Young's June 1999 Opinion, because none of them mentions the audit opinion or other misstatement attributable to Ernst & Young during the relevant time period, see id. at 415-16.

For example, Amorosa cites twelve articles published between January 2001 and June 2002, all of which discuss AOL's revenue projections and financial health. (See SAC ¶ 359.) None of these articles mentions the auditor or its June 1999 Opinion. (See SAC ¶¶ 359(a)&(b), (d)-(o).)

Plaintiff also cites three sets of alleged "disclosures" that address general accounting "problems" at AOL. (Id. ¶¶ 359(c), (m), (p).) These were: a July 11, 2001

31

article in *Fortune*, (<u>id.</u> ¶ 359(c)); the resignation of Barry Schuler, CEO of AOLTW's

AOL unit, on April 10, 2002 (<u>id.</u> ¶ 359(m)); an April 11, 2002 *New York Post* article

(<u>id.</u>); and "rumors" that "swirled" on June 25-27, 2002, regarding AOL's prospective

restatement of its advertising revenues (<u>id.</u> ¶ 359(p)).  Specifically, Amorosa states that:

> On June 25-27, 2002, rumors swirled that AOL was restating its
> advertising revenue.  On June 26, 2002 concerns over the viability of cable
> stocks, rumors that AOLTW would pre-announce its second quarter
> results below expectations, and rumors that the Company might restate its
> financial results hit the market.

<u>Id.</u>

Judge Kram already ruled that the *Fortune* and *New York Post* stories cannot be

deemed "corrective disclosures" because they did not include enough information to call

Ernst & Young's June 1999 Opinion into question.  <u>See</u> <u>AOL II</u>, 503 F. Supp. 2d at 678-

80.  Likewise, the resignation of Barry Schuler, in and of itself, is insufficient to support

an allegation that the auditor's June 1999 Opinion contained misstatements or omissions.

Further, the third set of disclosures—unattributed rumors regarding the possibility that

AOL would restate its advertising revenues for some undisclosed dates—does not

reference the June 1999 Opinion, and in any event, is not even linked to a media source.

Such conclusory allegations are plainly insufficient.

Finally, Amorosa cites two reports that he says reveal SEC investigations of AOL.

The first is a *USA Today* article on May 21, 2002, that allegedly "reported that the

Securities [and] Exchange Commission ('SEC') was looking closely at 'bartering'

transactions, and identified AOLTW as one company relying on this type of transaction."

(<u>Id.</u> ¶ 339(n).)  But the *USA Today* article does not actually say anything about AOL's

accounting practices.  <u>See</u> <u>supra</u> Part III.A.1.

The other "disclosure" is the conclusory statement that: "On July 25, 2002, it was disclosed that the SEC was investigating the accounting practices of AOLTW's AOL unit." (See id. ¶ 339(r).) Even if this disclosure did not post-date the July 18 and 19, 2002, *Washington Post* articles, it is clearly insufficient to serve as the basis for liability. While anonymous sources do not necessarily need to be identified, at a minimum, a plaintiff must provide descriptions of any unnamed sources sufficient to allow the court "to infer that the witnesses are likely to possess the information contained in their statements." In re Xethanol Corp. Sec. Litig., No. 06 Civ. 10234, 2007 WL 2572088, at *3 n.3 (S.D.N.Y. Sept. 7, 2007); accord Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (requiring plaintiffs to "supply sufficient facts to support their allegations" based on anonymous sources). Further, Amorosa's allegation provides an insufficient basis to support an inference that the information actually leaked into the market, since he has provided no source of publication for the alleged "disclosure." See id.

Amorosa tries to evade the force of this logic by noting that AOLTW's stock price dropped by a statistically significant amount after each of these articles appeared. (See generally SAC ¶ 359.) He further asserts—in wholly conclusory fashion (which this Court ignores on a motion to dismiss)—that the stock price occurred "due to news specific to AOLTW, and not explained by market or industry factors." (Id.)

It may be—indeed, it probably is—true that declines in the stock price of AOLTW that followed hard on the appearance of these articles can be attributed to the appearance of the articles. But that does not save plaintiff's Section 11 allegations. The fact of a drop in the stock price after the appearance of a news story, without more, is insufficient to give rise to an inference that Ernst & Young's negligence in certifying *the*

33

*June 1999 financial statements* (as opposed to anything else) caused the stock price to drop—especially where, as here, there is no mention of Ernst & Young or the June 1999 audit opinion in any of the pre-July 18, 2002 articles mentioned in plaintiff's second amended complaint.  Plaintiff's persistent failure to focus his "corrective disclosure" analysis pleading on purported misstatements by *Ernst & Young*—and, in the case of his Section 11 claim, on misstatements that were contained in one specific audit opinion, the June 1999 opinion—make it impossible to take that "analysis" seriously.

 So the earliest "corrective disclosure" that could arguably be connected to the 1999 audit opinion is, as Judge Kram found, the *Washington Post* story that ran on July 18, 2002.  And because that is the relevant corrective disclosure for Section 11 purposes, Amorosa's Section 11 claim is doomed, because he suffered no losses following July 18, 2002.

It is true that in a Section 11 case, a court *presumes* that harm occurred based upon the alleged misstatement, and the defendant must rebut the presumption of loss before it can prevail. Loss causation is not an element of the cause of action under Section 11, so the plaintiff need not plead it, as he had to with claims brought under Sections 10(b) or 14(a).  See In re Giant Interactive Group, Inc. Sec. Litig., 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) (citing cases).

However, where it is clear, from the pleading and from facts that can be judicially noticed (i.e., the stock prices on the relevant dates), that the plaintiff incurred all his losses in AOLTW *prior* to the date of the corrective disclosure (July 18, 2002), a plaintiff's Section 11 claim can and should be dismissed at the pleading stage.  See In re

Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 253-55 (granting motion to dismiss).

In this case, AOLTW's stock price increased between July 18, 2002, and May 29, 2003. Therefore, it is clear from the face of the pleadings that plaintiff suffered no damages following the relevant corrective disclosure, and his Section 11 claim must be dismissed.[1]

## IV.   Plaintiff's State Law Claims Are Preempted by SLUSA

Ernst & Young also argues that Amorosa's state law claims for common law fraud, aiding and abetting common law fraud, and aiding and abetting breaches of fiduciary duty, should be dismissed because they are preempted by the SLUSA. (E&Y MTD at 12.) Ernst & Young argues in favor of preemption on the ground that Amorosa's action arises from "the same operative facts" as the Opt-Out Complaint that Judge Kram previously adjudicated. (Id. at 13.) In fact, Amorosa's complaint is identical in almost every way to the Opt-Out Complaint. And while Amorosa seeks damages for himself alone, if his case is aggregated with the cases brought by the Lerach Opt-Outs, all of the complaints considered collectively seek damages on behalf of more than 50 people. These facts are undisputed.

The parties disagree about whether Amorosa's suit can be considered a "covered class action" because it "proceed[ed] as a single action" with the Opt-Out plaintiffs'

---

[1] Judge Kram did not discuss lack of damage under Section 11 in AOL II, 503 F. Supp. 2d 666, probably because she was dealing with numerous complaints and the circumstances of each of the 200 Lerach Opt-Outs were different. But this issue disposes of Amorosa's Section 11 claim, and so causes me to reach a different conclusion than she did about the viability of the limited Section 11 claim that she recognized.

The fact that Amorosa's lack of damage is dispositive also makes it unnecessary to analyze whether the radical change in the standard for pleading a viable claim for relief under Rule 8—a change ushered in by the Supreme Court's opinions in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), both of which post-date the issuance of AOL II, 503 F. Supp. 2d 666—would have caused Judge Kram to dismiss the Section 11 claim in the Opt-Outs' Complaint. It may well have.

cases.  Ernst & Young argues that Amorosa's lawsuit proceeded as "a single action" with the Opt-Out plaintiffs' cases when Amorosa assented to a stay of litigation pending resolution of the motion to dismiss the Opt-Out plaintiffs' complaints. (Id. at 13-14) Ernst & Young notes that SLUSA must be interpreted broadly to effect the statute's remedial purpose, and under a broad reading, the Opt-Outs' and Amorosa's complaints were functionally a single action because Amorosa "obtained the benefit of [ ] coordination" through the litigation stay.  (Id. at 13.)

Ernst & Young also alleges that Amorosa's attorney, Christopher Gray, routinely engages in procedural shenanigans, pursuant to which he is able to circumvent the strictures of SLUSA by "requesting a stay of pleadings and discovery to allow for informal coordination without seeking formal joinder or consolidation." (Id. at 14.) Specifically, the auditor points out that in Ventura v. AT&T Corp., No. 05 Civ. 5718, 2006 WL 2627979 (S.D.N.Y. Sept. 13, 2006), Mr. Gray used upon a bad faith procedural strategy not unlike that at issue here.  (See id.)

As set forth below, this Court agrees that Congress clearly intended SLUSA to preempt actions such as this, and Amorosa's state law claims are dismissed as preempted by SLUSA.

A.    **Background of SLUSA**

SLUSA is one of a handful of securities statutes passed in the late nineties that were "intended to promote uniformity in the securities markets." Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 107 (2d Cir. 2001).  It followed the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which was enacted to curb so-called "strike suits"—meritless claims alleging fraud in the sale of securities.  Id. (internal quotations

omitted).  Such suits were especially problematic because the expense of defending against such an action meant that issuers were often forced to settle, regardless of the merits of the action.  See id. (citing H.R. Conf. Rep. No. 105-803 (1998)).  In fact, one study of securities class actions published in the years before the PSLRA and SLUSA concluded that for practical purposes, the merits of a securities class action had no bearing on settlement outcomes.  See Janet Cooper Alexander, Do the Merits Matter?  A Study of Settlements in Securities Class Actions, 43 Stan. L. Rev. 497 (1991).

The PSLRA aimed to raise the pleading standards and instituting a mandatory stay of discovery "so that district courts could first determine the legal sufficiency of the claims in all securities class actions."  Lander, 251 F.3d at 107 (citation omitted).  However, by 1998, it became clear that litigants were regularly sidestepping the PSLRA's heightened pleading requirements by filing in state rather than federal court.  Id. (citing Pub. L. No. 105-353 § 2(2)).  Specifically, Congress reported that the decrease in federal securities actions post-PSLRA corresponded with an almost identical surge in state court securities-related cases.  See id. at 108 (citing H.R. Conf. Rep. No. 105-803 (1998)).

SLUSA was enacted to close this loophole.  The statute's primary purpose was to make "federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law."  Id. at 108 (citing 15 U.S.C. §§ 77p(b)-(c)).  Accordingly, SLUSA's preemptive scope reaches "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—(I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated,

or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii).[2]

And SLUSA mandates that no such "action based upon the statutory or common law of

any State or subdivision thereof may be maintained in any State or Federal court by any

private party alleging . . . a misrepresentation or omission of a material fact in connection

with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A).

### B.    The Finding of SLUSA Preemption in <u>AOL II</u>

In <u>AOL II</u>, the Opt-Out Plaintiffs had argued that their state law claims should

not be preempted by SLUSA because "none of the individual actions [brought] state law

claims from any one state for more than 50 people." 503 F. Supp. at 672 (internal

quotations omitted). Similarly, Amorosa argues here that the "plain language of SLUSA

does *not* sweep [his] individual action for damages as a 'covered class action.'"

(Amorosa MTD Opp. at 24 (emphasis in original).) In <u>AOL II</u>, Judge Kram explicitly

rejected the same argument, noting that "this observation ignores the fact that the

'individual actions," once aggregated per SLUSA's instructions are a 'covered class

action' for the purpose of SLUSA and are properly subject to the Act's limitations on

mass actions." <u>AOL II</u>, 503 F. Supp. 2d at 672. Judge Kram further explained that to

give *ad seriatim* treatment to otherwise essentially identical complaints would allow

plaintiffs "through artful pleading . . .[to] avoid the clear precepts of SLUSA and its

preemption of state law securities claims for damages." <u>Id.</u> (internal quotations and

citation omitted). Thus, she flatly rejected the argument advanced by the Opt-Outs that

---

[2] SLUSA is codified in two separate sections of the federal securities laws, 15 U.S.C. § 77p (amending the Securities Act of 1933) and 15 U.S.C. § 78bb(f) (amending the Securities Exchange Act of 1934). Because SLUSA amended the 1933 and 1934 Acts in "substantially similar ways," see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006), for the sake of brevity and clarity, the Court's citations to relevant SLUSA provisions will be limited to the language amending the 1934 Act.

they were entitled to "the benefits flowing from joint prosecution of their claims" without the strictures imposed by SLUSA. Id.

## C.   Relevant Precedent

Other courts in this District have not been shy to apply SLUSA to preempt state law claims when confronted with similar circumstances. For example, in In re Worldcom, Inc. Sec. Litig., 308 F. Supp. 2d 236 (S.D.N.Y. 2004) ("Worldcom I"), Judge Cote held that the state law claims of ten plaintiffs were preempted when they were transferred to the court where the main class action was pending, even though each of the plaintiffs sought damages on behalf of fewer than 50 people. Id. at 245. In so holding, she explained that the plaintiffs' actions considered collectively sought damages on behalf of more than 50 people, and the cases could be considered cumulatively because they "had proceed[ed] as a single action for any purpose" under SLUSA as evidenced in part by the fact that "the plaintiffs' court filings are exact replications or simple joinders to each others' papers." Id. at 246.

Similarly, in Gordon Partners v. Blumenthal, No. 02 Civ. 7377, 2007 WL 1438753 (S.D.N.Y. May 16, 2007), aff'd, 293 Fed.App'x 815 (2d Cir. 2008), Judge Kaplan approved of the magistrate's finding in that case that the group of lawsuits had proceeded "as a single action for any purpose" based upon the fact that they had been consolidated for pretrial purposes. Gordon Partners v. Blumenthal, No. 02 Civ. 7377, 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) at *18 (Magistrate Judge Peck's Report and Recommendation). Thus, although no single complaint in that case sought damages on behalf of more than 50 people, since the plaintiffs totaled more than 50 when the cases were aggregated, SLUSA was properly applied to bar state claims. Id.

In fact, it appears that only one court in this District has ever declined to apply SLUSA under circumstances akin to those presented here. See Ventura v. AT&T Corp., No. 05 Civ. 5718, 2006 WL 2627979 (S.D.N.Y. Sept. 13, 2006) (Stanton, J.). In Ventura, the plaintiff investor brought claims for violations of sections 20(a) and 10(b) of the 1934 Act as well as various state law claims. Id. at *1. The plaintiff's factual allegations and his claims for violations of the securities laws in that case were "substantively identical to those in the first amended and consolidated class action complaint" in another case, Leykin v. AT&T Corp., No. 02 Civ. 1765 (filed Feb. 24, 2005). Id. Subsequently, although the plaintiff's federal claims were ultimately dismissed for the same reasons that the federal securities claims in the Leykin class action were dismissed, see id. at *1-2 (citation omitted), Judge Stanton nevertheless held that the plaintiff's state law claims were not preempted by SLUSA because Ventura had been proceeding along "a separate procedural track." Id. at *1.

The two-page unpublished decision provides little detail about the basis of Judge Stanton's conclusion regarding the procedural posture of the cases. As a result is of limited directional value for other courts in this District. Cf. Gordon, 2007 WL 431864, at *18 (distinguishing Ventura). However, his holding does appear to have been based in part upon a stipulation and order postponing the defendants' time to respond to the complaint until thirty-days after the motions in the class action were resolved. See Ventura, 2006 WL 2627979 at *1. Although Amorosa and Ernst & Young are parties to a similar agreement in this case, even Amorosa concedes that Ventura "is inapposite" because its "procedural posture" was entirely different given a series of appeals that

prolonged and complicated that case, presumably mandating the litigation stay in that case. (Amorosa MTD Opp. at 9 n.1.)

Further, were the procedural posture of the case indistinguishable, Judge Stanton's holding in Ventura would eviscerate SLUSA's core provision, which defines a covered class action relevant part to include two or more "lawsuits [that] are joined, consolidated, or otherwise proceed as a single action *for any purpose*." 15 U.S.C. § 78bb(f)(5)(B)(ii)(II) (emphasis added).  To interpret this language as covering only lawsuits that are formally "joined or consolidated" would be to render the statute's description of the latter category of covered actions—lawsuits that "otherwise proceed as a single action for any purpose"—entirely redundant.  Such an interpretation would run counter to the canons of statutory construction, which require courts "to give effect, if possible, to every clause and word of a statute." State St. Bank & Trust Co. v. Salovaara, 326 F.3d 130, 139 (2d Cir. 2003) (internal quotations omitted).  Additionally, the plain language of the statute itself clearly employs two disjunctives, "or" and "otherwise," in order to signal the introduction of a third category of covered actions.  It is well-established that "where the statutory language provides a clear answer," the plain language of the statute governs and a court's task of statutory interpretation ends there. Raila v. United States, 355 F.3d 118, 120 (2d Cir. 2004).  Accordingly, this Court holds that an action need not have been formally joined or consolidated with other actions in order to be a "covered class action" and subject to SLUSA's preemption provision.

**D.     Amorosa's State Law Claims**

While Amorosa's opt-out action was never formally coordinated or consolidated with that of the other Opt-Outs, as was the case in Worldcom I, 308 F. Supp. 2d at 239

(pretrial consolidation).  It is unquestionably the case that Amorosa's action "proceeded as a single action" with the multidistrict litigation ("MDL") action assigned to Judge Kram.  Indeed, Amorosa appears to have availed himself of every opportunity to ensure that this would occur.

First, he filed a civil cover sheet identifying his case as "related" to the main class action, explaining that his "allegations on the securities fraud claim [were] *identical* to those made in the class action." (Civil Cover Sheet filed by Dominic F. Amorosa, Form JS-44, Amorosa v. AOL Time Warner, Inc., No. 03 Civ. 3902, at 3 (May 29, 2003) (emphasis added).)  As a result, his case was assigned to Judge Kram who was handling all of the "related" AOLTW cases by order of the Judicial Panel on Multidistrict Litigation.  The assignment of Amorosa's related case to Judge Kram, where it would necessarily be handled in coordination with the AOLTW cases—absent any objection by Amorosa— is enough to make Amorosa's action a "covered class action" as that term is used in SLUSA.

Several additional facts alone compel a finding that Amorosa's case falls under the ambit of SLUSA.  He replaced his initial complaint with a first amended complaint that was identical in all material respects to the Opt-Outs' Lerach Complaint.  Then, he agreed to stay proceedings in his action pending resolution of the motions to dismiss both the class action and Opt-Outs' complaints, on the ground that his complaint was—not surprisingly—"substantially similar" to both the main class action complaint and the Lerach Complaint, Amorosa announced that he wished to avoid "burdening the Court with duplicative briefing on the same or similar issues." See Order Granting Stay at 2.  Thus, Amorosa's recent assertion that there was a total "lack of coordination" between

his action and the Opt-Outs' actions (Amorosa MTD Opp. at 25) rings hollow.  His case was deferred pending the resolution of Lerach's case, which indicates that Judge Kram was handling them in coordination with each other.  He obviously obtained the benefit of coordination with those cases while they were still pending.

SLUSA thus preempts Amorosa's state law claims.  This disposes of the remainder of Mr. Amorosa's claims, and his complaint is dismissed in its entirety.

**V.      Sanctions**

      **A.      Legal Standard**

Defendant has moved pursuant to Federal Rule of Civil Procedure 11 for an award of sanctions against Amorosa's attorney (Christopher J. Gray, P.C.), including its reasonable attorneys' fees and costs incurred in bringing this action.  Rule 11(b) of the Federal Rules of Civil Procedure provides that:

> By presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needlessly increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversing of existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information or belief.

In actions asserting federal securities violations, Rule 11 must be read in conjunction with the PSLRA's sanction provisions, which state, in relevant part:

(c)  Sanctions for abusive litigation

(1) Mandatory review by the court

In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

(2) Mandatory sanctions

If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure.  Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

(3) Presumption in favor of attorneys' fees and costs

(A) In general

Subject to subparagraphs (B) and (C), for purposes of paragraph (2) [the mandatory sanctions provision], the court shall adopt a presumption that the appropriate sanction—

(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

(ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

(B) Rebuttal evidence

44

> The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that—
>
>> (i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or
>>
>> (ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.
>
> (C) Sanctions
>
> If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(c).

Thus, the PSLRA requires district courts, at the conclusion of private actions arising under federal securities laws, to make Rule 11 findings as to each party and each attorney. See 15 U.S.C. § 78u-4(c)(1); see also, Rombach v. Chang, 355 F.3d 164, 178 (2d Cir. 2004). At that time, if the Court finds that a violation has occurred, the imposition of sanctions is mandatory. 15 U.S.C. § 78u-4(c)(2). The PSLRA removed the judicial discretion of Rule 11 ("the court *may . . .* impose sanctions") in favor of a rebuttal presumption: "Courts *shall* adopt a presumption that the appropriate sanction . . . for substantial failure of any complaint to comply with any requirement of Rule 11 . . . is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action." 15 U.S.C. § 78u-4(c)(3)(A)(ii) (emphasis added).

In Gurary v. Nu-Tech Bio-Med, Inc., 303 F.3d 212 (2d Cir. 2002), the Second Circuit articulated a three-step sanction inquiry for district courts to follow in situations where a plaintiff, like Amorosa, has brought multiple claims. See id. at 223. First, the

Court must determine whether frivolous claims have been brought.  Id.  Second, if such claims have been brought, the Court needs to determine whether non-frivolous claims have also been joined.  Id.  Third, the sanctions presumption may be rebutted if the Court determines that the violation was either de minimis or if the violator can show that full sanctions would constitute an unreasonable burden.  Id.

Amorosa's federal claims (which comprise half of his total claims) patently lack merit.  It thus appears that Amorosa's filing failed to comply with Rule 11, and sanctions against Mr. Gray are warranted.

However, this Court has not had the benefit of any briefing on sanctions under the PSLRA.  In fact, this Court has had very little substantive briefing on sanctions at all; the briefs that purport to address Rule 11 appear to have been little more than a pretense for ad hominem attacks.  As a result, this Court lacks sufficient information to determine, for example, whether an imposition of attorneys' fees would be an unreasonable burden upon Mr. Gray, an issue this Court is required to make findings about under the PSLRA.  See id.

Accordingly, the parties are ordered to provide a new round of briefing on sanctions on the following schedule: (1) Within 10 business days, Ernst & Young will provide an estimate of the reasonable attorneys' fees it seeks; (2) Within 10 business days of receipt of Ernst & Young's estimate, Mr. Gray will show cause (in 10 pages or less) why sanctions should not be imposed on him; his brief should address specifically, inter alia, whether the fees proposed by Ernst & Young would pose an unreasonable burden on him; (3) Within 5 business days of receipt of Mr. Gray's brief, Ernst & Young shall respond (in 10 pages or less), or notify this Court that it does not intend to file a response.

All briefs submitted by the parties must be professional, engage in substantive legal analysis, and comply with the individual rules of this Court.  If either brief fails to meet this standard, as the parties' previous Rule 11 briefs did, this Court will not hesitate to strike that brief.

## CONCLUSION

Defendant's motion to dismiss (Docket No. 11) is granted in its entirely. Defendant Ernst & Young is instructed produce an estimate of the reasonable attorneys' fees it seeks under Rule 11 within 10 business days of the date of this order. Plaintiff's attorney, Mr. Christopher Gray, is ordered to show cause (in 10 pages or less) why sanctions should not be imposed, and he should do so within 10 business days of receipt of the fee estimate. The Clerk of the Court should immediately remove the motion to dismiss (Docket No. 11) from the Court's outstanding motion list.

This constitutes the decision and order of this Court.

Dated: November 30, 2009

_____
U.S.D.J.

BY MAIL TO ALL COUNSEL